Green, C. J.
The bill in this cause is filed by the administrator of Elizabeth Hait to recover a distributive share of the residue of the personal estate of William Jauncey, deceased, to which it is alleged that the said Elizabeth Hait became entitled as one of the next of kin of the said William Jauncey.
The right and interest of Elizabeth Hait, the complainant’s intestate, in the estate real and personal of which William Jauncey may have died intestate, was assigned by her to Herman Thorn, one of the defendants, by deed of assignment hearing date on the 27th of March, 1833. That assignment the bill seeks to avoid, as obtained by fraud and undue influence.
In pursuance of that assignment, and of a decree of the Court of Chancery of the State of Hew York, the share and interest of Elizabeth Hait in the residue of the estate of *704 William Jauncey, was paid by John Rutherford, the surviving executor of Jauncey, to James A. Hamilton, the administrator of William Jauncey Thorn, and by him paid to Herman Thorn, the father and next of kin to the said William Jauncey Thorn. For the purposes of this cause, the payment of the money by the surviving executor of Jauncey will be regarded as a payment by him directly to Herman Thorn. The bill prays an account and a decree for the recovery of all the moneys thus paid, or which have come to the hands of Herman Thorn with the consent of John Rutherford.
The material issues made by the defendant’s answer are—
First. That all the personal estate of William Jauncey was absolutely disposed of in and by his last will and testament. That there was no intestacy as to any portion of the said personal estate, and that no part thereof did or could vest in the said Elizabeth Hait as his next of kin.
Second. That all the right and interest to which Elizabeth Hait was or could have been entitled in the estate of William Jauncey, in case of his intestacy, was assigned by the said Elizabeth Hait to Herman Thorn, one of the defendants, by a legal, valid and operative deed of assignment, in nowise tainted with fraud.
Third. That the share and interest of the said Elizabeth Hait, if any there was, in the said estate, was paid by the surviving executor of the said William Jauncey to Herman Thorn, under and by virtue of a decree of the Court of Chancery of the State of New York; that the said decree remains in full force, and is final and conclusive upon the rights of the parties.
Fourth. That the claim of the complainant is barred by the statute of limitations — more than six years having elapsed from the time of the payment of the legacy by the surviving executor of William Jauncey before the filing of the bill in this cause.
William Jauncey, of the city of New York, died on the 19th of September, 1828. At the time of his death he was seized and possessed of a very large and valuable real and *705 personal estate in England and America. By his will, executed and published in due form of law, having given and devised large portions of his real and personal estate, the testator further gave and bequeathed as follows:
“ I give and bequeath all the residue and remainder of my property, both in England and America, of every kind and description whatever, to the said William Jauncey Tliorn, when he arrives at the age of twenty-one years, to him and his heirs forever.”
The legatee, William Jauncey Thorne, (having, in compliance with the desire and injunction of the testator, assumed the name of William Jauncey,) died before he arrived at the age of twenty-one years.
Whether, by the terms of the will, the residuary legacy vested, upon the death of the testator, in the legatee, so as to be transmissible to his representatives; or whether the legacy was contingent upon the legatee’s attaining the age of twenty-one years, and by his death before that period lapsed, leaving the testator, as to the property included in the legacy, intestate, is the question submitted for consideration.
The general rule applicable to this question, adopted both in the ecclesiastical courts and courts of equity, is well settled. Where the time specified in the bequest is annexed to the payment only, as where the legacy is given, payable or to be paid when the legatee attains the age of twenty-one years, the legacy vests immediately upon the death of the testator. It is a present gift. The time of payment only is postponed. But where the time is annexed not to the payment only, but to the gift itself, as when the legacy is given to the legatee at twenty-one, or “ if” or “ when ” he attains the age of twenty-one, the legacy does not vest until the legatee attains that age. The gift is upon the condition that the legatee shall attain the age specified. His attaining that age is a condition precedent; and if the condition be not fulfilled, the legacy never vests. The cases upon this subject are very numerous, and with few exceptions the rule will be *706 found to have been for more than a century inflexibly maintained.
This distinction as to the form of the bequest was recognized in the case of Stapleton v. Cheales, in the year 1711; and in Fonnereau v. Fonnereau, decided in 1748, Lord Hardwicke declared that the distinction was then absolutely settled. Stapleton v. Cheales, Prec. in Chan. 317; Cruse v. Barley, 3 P. W. 20; Smell v. Dee, Salk. 415; Fonnereau v. Fonnereau, 3 Atk. 645; Goss v. Nelson, 1 Burr. 227; Lane v. Goudge, 9 Vesey 229; Swinburne on Wills 313, 315.
In May v. Wood, 3 Brown’s Chan. Cas. 417, Lord Alvanley, master of the rolls, recognizing the general rule, held, nevertheless, that where a legacy was given when the legatee attained a given age, the term “ when ” should not be deemed a condition precedent, upon which the legacy was to vest, but as merely denoting the period of payment. He is reported as saying that “ all the cases for half a century upon pecuniary legacies had determined that word, not as denoting a condition precedent, but as only making the period when the party shall have the full benefit of the gift.” The accuracy of the report, both as to the statement of the fact and the principle, has been justly questioned.
In the later case of Hanson v. Graham, 6 Vesey 239, the question was examined by Sir William Grant, master of the rolls, with his accustomed care and ability. It was held by him, both upon principle and upon authority, that the word “ when,” standing alone and unqualified in the gift of a legacy, is a word of condition, denoting the time when the gift is to take effect in substance, and not the .mere time of payment. That a gift “ at ” twenty-one, or “ if ” or “ when ” the legatee shall attain the age of twenty-one, were all one and the same, and in each of these cases, if the legatee die before that time, the legacy lapses. Citing this doctrine from the decision in Stapleton v. Cheales, he adds, “ I do not find any case in which this position has ever been contradicted.”
The modern authorities regard the doctrine as fully settled in accordance with the ancient rule, and the views ex *707 pressed in Hanson v. Graham, 1 Jarman on Wills 764, 1 Roper on Leg. 553; 2 Williams on Ex’rs 1052; Patterson v. Ellis’ Ex’rs, 11 Wend. 260.
IL the civil law, says Roper, adopting the views of Sir William Grant,) the words “when” and “if” are of the same import in speaking of an uncertain event. Both-are words of condition annexed to the very gift of the legacy, when unexplained by the context of the will. The construction is the same in courts of equity, which adopt the rules of the civil code upon this subject. 1 Roper on Leg. 570.
It is contended, however, that although this doctrine may be established in respect to particular legacies, it does not apply where a residue is the subject of the bequest, because its effect would be to create an intestacy in regard to a portion of the testator’s property. There is certainly (as was observed by the master of the rolls, in Leake v. Robinson, 2 Mer. 385,) a strong disposition in the court to construe a residuary clause so as to prevent an intestacy in regard to any part of the testator’s property. This point was strongly relied on by Lord Alvanley in Booth v. Booth, 4 Vesey 399, although on a previous occasion he appeared to regard the distinction as groundless. But neither in that case nor in any other which has been referred to, was the decision rested upon that ground alone, and a different rule of construction applied to the bequest of a residue, It is undoubtedly a circumstance to which some weight may attach, and which, in a doubtful case, may control the construction. Love v. L’Estrange, 3 Bro. Par. Cas. 397; May v. Wood, 3 Bro. Chan. Cas. 473; Hanson v. Graham, 6 Vesey 248; Jones v. McIlwain, 1 Russ. 220; Leake v. Robinson, 2 Mer. 386.
The general rule applies as well to bequests of the residue as to particular legacies; a decisive objection to adopting a different rule of construction would be, that it would necessarily lead to different interpretations of the same language in different parts of the same instrument.
The terms of the' residuary clause standing alone confer upon the legatee, not a vested but a contingent interest only. The construction of the terms of a particular legacy is, how-
*708 ever, always liable to be controlled by the intent of the testator apparent in other parts of the will. If, therefore, it appears from any expression or direction contained in the will, or if it can fairly be deduced from the entire instrument that the intention of the testator was that the legacy shall vest immediately, such intention shall prevail. Under such circumstances, words which, standing alone, would operate as words of condition, will be construed to designate only the time when the interest shall take effect in possession. It .is insisted in the present case, that the fact that the estate is placed in the hands of trustees, and that the residuary legatee is to be maintained out of the trust fund, will operate to control the words of the residuary clause, and vest the legacy immediately on the death of the testator. Where the interest of the legacy is directed to be paid to the legatee until he receive the principal, or where the legacy is placed in the hands of trustees for the exclusive benefit of the legatee until it is directed to be paid over, the legacy will be deemed vested. Stapleton v. Cheales, Prec. in Chan. 317; Lane v. Goudge, 9 Vesey 229; Hanson v. Graham, 6 Vesey 249; Hoath v. Hoath, 2 Bro. Chan. Cas. 3; Fonnereau v. Fonnereau, 3 Atk. 645; 1 Jarman 764; 1 Roper 572.
But in the preéent instance there is no severance of the legacy from the rest of the estate, and no appropriation of the interest to the separate benefit of the legatee; on the contrary, the whole estate, real and personal, is vested in the hands of the trustees, who are to receive the entire interest, rents and profits for the general purposes of the will. The legatee is to receive not the interest of the residuary legacy, but a maintenance and education from the general fund, in common with the other children of Jane Mary Thorn. Such a disposition of the estate can raise no presumption of an intention on the part of the testator that the legacy should vest immediately.
The indications of the testator’s intention to be deduced from the general provisions of the will, seem to militate strongly against the construction contended for by the de *709 fendant’s counsel. The testator has bequeathed by apt words several vested legacies. In regard to some of them the time of payment is designated. All the legacies to the children of Jane Mary Thorn are by apt words bequeathed as contingent legacies; they are all given either when the legatee arrives at the age of twenty-one, or upon his or her arriving at that age. These legacies, exclusive of the residue, exceed the sum of three hundred thousand dollars. If these legacies be construed to be contingent, then, upon the death of any of the children other than the residuary legatee, his or her share would fall into the residue of the estate and vest in the residuary legatee, the peculiar object of the testator’s bounty. It is only upon the death of the residuary legatee that a result could follow hostile to the general design of the testator.
But if these legacies be construed as vested, then, upon the death of each child living, his or her interest in the estate would go not to the residuary legatee or one of the children of Jane Mary Thorn, for whom it was the peculiar design of the testator to provide, but to the father of the children whose name is not mentioned in the will, and whom it is apparent that the testator never designed to benefit. Such a result cannot be presumed to have been within the intention of the testator.
From the language of the residuary clause, as well as from the entire will, I am of opinion that by well-settled rules of construction the bequest of the residuary estate conveyed to the legatee not a vested but a contingent interest only — that his attaining the age of twenty-one years was a condition precedent to the vesting of the legacy — that by the death of the legatee before he attained that age, the legacy lapsed — and as to that portion of his estate that William Jauncey, the testator, died intestate, and consequently that Elizabeth Hait, the complainant’s intestate, was entitled to a distributive share of the residue, as one of the next of kin of the testator.
Second. This leads to the second inquiry, viz.: Whether the assignment made by Elizabeth Hait to Herman Thorn, *710 of her interest in the residuary estate of William Jauncey, was valid or procured through fraud.
The bill charges that the assignment was executed in the presence of Francis Griffin, the solicitor and counsel of Herman Thorn, the assignee; that at the time of the execution of the instrument, the amount and nature of Miss Hait’s interest in the estate was not made known to her ; that she was told that her interest was not worth over five thousand or six thousand dollars; that it was particularly concealed from her what was given to the other next of kin for their interest in the estate; that Griffin joined with Thorn in entreaties, threats and arguments to induce her to execute the instrument ; and that, as counsel, he advised her that she had no interest in the residuary estate, and that she had better take whatever Thorn might offer her.
The assignment bears date and purports to have been executed on the 27th of March, 1833, in the presence of Matthias Brant as subscribing witness. The subscribing witness is dead. His signature is proved, and it is also proved that he was a neighbor of Miss Hait’s, and on terms of friendly intercourse with her. The deed of assignment purports to have been re-acknowledged on the 3d of May, 1833, in the presence of Francis Griffin.
Mr. Griffin has been examined as a witness. He states that he was a solicitor of Herman Thorn, in two suits pending in the Court of Chancery of New York in relation to this residuary estate. That on the 3d of May, 1833, he accompanied Colonel Thorn to Miss Hait’s residence. That the original deed of assignment of Miss Hait to Thorn was there produced, and re-acknowledged by Miss Hait. At the same time she produced a bond for six thousand dollars, given to her by Colonel Thorn, bearing even date with the assignment, and executed in the presence of Matthias Brant as subscribing witness. The bond was paid, and a receipt for the amount was endorsed upon the assignment, and signed by Miss Hait, in the presence of the witness. This statement is verified by the production of the papers.
Miss Hait executed at the same time, in the presence of *711 the witness, two other papers purporting to be authorities for solicitors to appear for her in the two suits pending in Now York, in each of which she was a party defendant. The papers were read over to her, and their contents and object fully explained. She read them herself carefully; said that she was nervous about signing papers; that she was not accustomed to it, and that, when she executed the assignment in favor of Thorn, she had hoped the matter was closed, and that she would have no more papers to sign, but that it was her wish that Mr. Thorn should have the full benefit of the assignment, and that, if it was necessary for the purpose of iacilitating the arrangement, she would sign them; and, on being told that it would facilitate matters, she signed the papers in the presence of Mr. Griffin, who thereupon signed them as subscribing witness.
The witness further testifies that Miss Hait appeared to be a woman of good common sense and understanding, and to understand entirely what she was about; that no misrepresentations or concealment, threats, undue influence, or influence of any kind was made use of towards her; and that she seemed perfectly willing to carry out the arrangement.
A compromise had at that time been agreed on between Herman Thorn and five of the next of kin of William Jauncey, by which Thorn had agreed to pay them two hundred and ten thousand dollars for their interest, being at the rate of forty thousand dollars per share for five shares, and ten thousand dollars for law charges. This whole compromise, and the terms of it, were told to Miss Hait, and were the subject of conversation. The residuary estate was spoken of as being very large. There was no concealment of any material fact. The whole conversation was based on the idea that, in receiving the six thousand dollars, Miss Hait was giving up to Mr. Thorn a large .substantial advantage.
This evidence was given many years after the transaction to which it relates, but the witness states that his memory was refreshed by a full written memorandum of what passed, made on the evening of the same day.
The testimony is certainly open to comment, and requires *712 the strictest scrutiny, on the ground that it comes from the solicitor and counsel of Thorn, who accompanied him to the residence of Miss Hait in that capacity, and for the purpose of becoming a witness to the transaction. But he is the subscribing witness to several of the papers — the only surviving witness to any of them, or to any part of the transaction between the parties in relation to the assignment. The bill, moreover, charges directly that he actively aided and participated in the alleged fraud. He is, therefore, not only a competent, but a proper and necessary witness in the cause. He was a counselor of good standing, and, so far as appears, of irreproachable character, at the New York bar. He is unquestionably an intelligent witness. His evidence is in no material point contradicted or impeached. In many particulars he is strongly corroborated by other evidence in the cause. He relies upon a written memorandum, made on the very day of the transaction. He speaks of matters to which his attention was - particularly directed. He speaks not of matters of opinion only, but mainly and in great detail to matters of fact, in regard to which there is little room for misapprehension or mistake.
There is no reason to discredit the testimony; indeed, upon a careful review of the whole case, there appears to be no evidence in the cause upon which the court can with more safety rely. It will be conceded that it is entitled to at least as much credence as the testimony of witnesses, who detail from memory, conversations and language heard more than. eighteen years previous to their examination, upon a subject, in which they were not particularly interested, and to which their attention was not specially directed. Such is the character of much of the evidence in this cause, upon which the charge of actual fraud is sought to be maintained. There would be manifest danger in resting a decree upon such evidence, even in the absence of conflicting testimony.
The evidence of Griffin cannot be regarded merely as proof of the confirmation of the original contract. It goes much further. The facts and circumstances detailed by him tend most strongly to prove that no such fraud was practiced in *713 procuring the original execution of the instrument, as is charged in the complainant’s bill. The evidence is very explicit and decisive in negation of the charges of actual fraud. After the death of the subscribing witness to the assignment, in the absence of all testimony as to the circumstances under which the instrument was originally executed, the evidence affords a satisfactory answer to the charges of concealment and misrepresentation of material circumstances contained in the bill of complaint.
Aside from the existence of actual fraud, regarding the assignment from Miss Hait to Colonel Thorn as a mere matter of bargain and sale, as an ordinary transfer of property by vendor to purchaser for a consideration, there is much in the evidence tending to support a charge of constructive fraud, which might entitle the complainant to relief in equity.
The parties to the negotiation did not stand upon equal ground. The purchaser was a man of business, in the prime of life, having superior opportunities of knowing, and probably knowing better than the vendor, the value of the subject matter of the contract.
The vendor was an unmarried female of the age of seventy-two years, of nervous and excitable temperament, of retired habits, leading a secluded life in the country, certainly not accustomed, and by her habits of life in some measure disqualified, to transact important business.
The contract was made by the vendor without the advice of counsel. It was consummated without the presence of a friend, against the wishes of her nearest relatives, and contrary to the advice of at least one of her neighbors, whom she previously consulted.
The consideration of the assignment was grossly inadequate. The price paid bore no relation whatever to the value of the property transferred.
In a case of bargain and sale, these circumstances alone, aside from any evidence of an actual fraud, are of a nature to quicken the vigilance, and to call into active exercise the protective powers of a court of equity. They afford grounds *714 upon which the court may interfere to relieve against unfair and unconscionable contracts.
It is not necessary, nor is it designed, to express any opinion as to the conclusion to which the evidence upon this point would lead, if the assignment should be viewed in the light of an ordinary sale. A careful and deliberate examination of the evidence in the cause, aided by the full and elaborate arguments of counsel, have led me satisfactorily to the conclusion that the assignment by Miss Hait to Colonel Thorn was not a mere bargain and sale for value, but that the transfer was made from other than pecuniary considerations. The grounds of that conclusion I shall proceed to state.
William Jauncey Thorn, the residuary legatee under the will of William Jauncey, died in England on the 18th of November, 1830. On the 26th of February, 1831, letters of administration upon his estate were granted, by the surrogate of the county of New York, to James A. Hamilton. He was the agent, and acted at the instance of Herman Thorn. In July, 1831, a bill was filed in the Court of Chancery of the State of New York, by all the next of kin of William Jauncey, except Elizabeth Hait, to recover their shares of this residuary estate. In that bill, although solicited so to- do, she refused to unite, and was necessarily made a party defendant. This conduct could have been produced by no influence of Colonel Thorn or of his family. They were all that time in Europe, and had been there several years; so far as appears, they had no correspondence whatever with Miss Hait until after the filing of the bill. James A. Hamilton’s first interview with her was had some months subsequently, with the view of inducing her to aid in the defence.
It may doubtless be suggested that her aversion to litigation may have deterred her from uniting in that suit for the recovery of her legal rights, but it is apparent from the evidence that she was influenced by other considerations.
This is very apparent from- her correspondence with Mrs. Thorn. That correspondence was commenced not by Mrs. *715 Thorn, but by Miss Hait. Her first letter was written on the 15th of June, 1831, just before the bill was filed, when the measure must have been in contemplation, and probably after she had been requested to unite in it. That letter is not in evidence, but its tenor may readily be inferred from the tone of the reply.
Under date of Paris, August 29th, 1831, Mrs. Thorn writes, “ 1 had the pleasure of receiving your very kind letter of June 15th, at Dieppe, where I was with all the family for change of air. * * I think when the estate is settled I shall return home, and hope we shall then meet again ; but I could not support being there now, to be harassed daily, as my heart is too sad and heavy to bear trouble if I can avoid it. Besides, we could do nothing by being present, and we have every confidence in Mr. Hamilton, and are certain that he will do everything in his power for us. The result we must leave to that great and merciful Being in whose power it is to give and to take.”
Under date of Paris, 4th October, 1831, Mrs. Thorn again writes, “Your last letter advises me to come home, and you express your regret that we are not in America to attend to our affairs ourselves, as you have learned that persons, Mr. Chapman and others, are devising plans to deprive us of our inheritance. If I would return, I cannot now, as my situation prevents me.” That Miss Hait had thus written to Mrs. Thorn cannot be doubted ; a false statement in regard to the contents of Miss Hait’s letter would never have been ventured upon in reply, no matter with what motive the reply was written.
It appears, then, that Miss Hait not only refused to unite with the other next of kin of William Jauncey for the recovery of her interest in this estate, but that she immediately wrote to Mrs. Thorn at Paris, requesting her to return home, and informing her that plans were being devised to deprive her and her children of their inheritance.
It appears from other parts of the evidence, that to others Miss Hait denounced the attempt as wicked and unjust, as being contrary to the well-known intention of William Jaun *716 eey. Mrs. Thorn appeals to her to aid herself and her children in recovering the property in opposition to the next of kin, upon the ground of Miss Hait’s knowledge of the well-known intentions and oft-repeated declarations of William Jauncey made in the hearing of Miss Hait, that the estate should go to Mrs. Thorn and her children. That appeal would not have been made, under the circumstances, had it not been founded in truth. It shows at least a clear conviction on the mind of Mrs. Thorn, that such were the views of Miss Hait.
Previous to the assignment to Thorn, Miss Hait had made an assignment of all her interest in the residuary estate to her three nephews, William, Jonathan E., and Benjamin Hoyt. According to her own account, the assignment was obtained from her by one of her nephews, upon the representations that he would give Mrs. Thorn one-half the amount recovered, and that that was the only mode in which any part of the estate could be secured to her. Upon being undeceived as to the necessity of any such measure to protect Mrs. Thorn’s interest, she demanded the return of the instrument, which was accordingly surrendered and- canceled. '
There is offered in evidence on the part of the complainant, a deed of assignment from Miss Hait to her three nephews, of her interest in the residuary estate of William Jauncey, for the consideration of one dollar and natural love and affection. The instrument bears date on the 8th of December, 1832. It is, of course, not relied on as a valid subsisting instrument. It would be fatal to the claim of the complainant. It seems never to have been acted upon, nor is it very clear for what purpose it was offered in evidence, except to impeach the accuracy of Miss Hait’s statement, or of Mr. Griffin’s testimony. It does not necessarily do either. It does show, however, that her interest was assigned to her nephews, without any pecuniary consideration, and that from some cause that they were not at liberty to use it.
Dr. Waldo Brown was called upon by Miss Hait, to consult him in regard to making the .assignment to Herman *717 Thorn. Thorn was present, urging that the assignment should be made. Miss Hait stated the amount that she was to receive, and that it was for her nephews. The advice of the witness was asked by Miss Hait, and given. Ho advised against the assignment, and refused to sign as a witness. He makes no suggestion that the price was inadequate, or that she was in danger of being defrauded. The only reasons assigned were that she previously promised it to her nephews, and that she would violate her promise if she assigned to Thorn.
The assignment to Herman Thorn purports to be made, not in consideration of six thousand dollars, but for one dollar, and for divers other good causes and considerations. The bond for six thousand dollars, given at the time of the transfer, expresses upon its face that the money was for her three nephews, viz.: two thousand dollars for Benjamin, two thousand dollars for William, and two thousand dollars for Edwards. Mr. Griffin, who was present when the money was paid, testified that Miss Hait said that the money was designed for her nephews. She wanted nothing for herself. The entire consideration, six thousand dollars, was subsequently paid by Miss Hait to her nephews, not one dollar of it having been retained for her own use.
It is in evidence that both before and after the assignment to Colonel Thorn she manifested much excitement and agitation in regard to it. She feared that she had done wrong in making the assignment. To her friend, the Rev. Dr. Magic, she expressed serious doubts whether she had done right about it. To another she said she had done wrong she had previously assigned her property to her nephews, and how could she assign it to Thorn. Admitting this evidence of conduct and declaration subsequent to the assignment to be competent as showing the state of her mind, it does not show that she felt that she was deprived of her just rights, that she was defrauded in the transaction, that she was deceived by false representations, or that she had received too small a consideration; on the contrary, the burden of the evidence clearly is, that the question in her mind *718 was not a question of pecuniary value, but of principle. It was not whether she had been defrauded, but whether she-herself had done what was right. Her nephews importuned her for this property, and exacted promises from her not to-convey it to others j some of her friends and neighbors, very-naturally, advised her to the same course. After the assignment had been made, the claims of her relatives were pressed upon her, and she was reminded of the promises she had' made.
On the other hand, it is obvious that she regarded the-property as justly belonging, not to herself, but to Mrs. Thorn and her children. Colonel Thorn, it appears in evidence, urged her to make the assignment to himself. She was probably aware that conveying to him, for whom she had no affection, would not secure it effectually to Mrs. Thorn and her children, whom she regarded as the rightful owners. These circumstances satisfactorily account for her agitation and excitement upon the subject; for her hesitation as to the course she should adopt; for her doubts and regrets after it had been adopted. They satisfactorily account for ail the vacillation and apparent inconsistency of her conduct.
On the 15th of June, 1832, Miss Hait made and published her will. The assignment of her interest in this residuary estate had not then been made. Thorn and his family were in Europe. The suits in regard to the estate were pending in New York. She had been solicited by both parties to unite in those suits. She must have been fully aware of the nature, if not of the extent, of her interest in this property. Yet she makes not the most remote allusion to it in her will. She leaves her real estate to her three nephews, Jonathan Edwards, William and Benjamin Hoyt; and after several small bequests to religious and charitable objects, and to her friends, she bequeaths the residue of her estate, if any, to her three nephews.
Elizabeth Hait (so far as appears in evidence) never-claimed this residuary estate as her own. She never demanded it. She refused to unite with the rest of the claim *719 ants in an action for its recovery. She declared that it. was not theirs, nor hers, but the rightful inheritance of Mrs. Thorn and her children. She refused to receive for herself one farthing’s consideration for the transfer. The money paid, she declared repeatedly, was not for herself, but for her nephews. It was so described on the face of the obligation. They, in fact, received the whole of it. She utterly ignored the existence of the claim in her will. She did no act indicating the least claim of right to the estate, except the mere act of transferring it from her control.
Hor can it be maintained that this was the result either of imbecility or ignorance of her rights; on the contrary, the fair conclusion from the evidence is, that her judgment was influenced by a knowledge of the wishes of her relative, William Jauncey, and by a strong conscientious sense of duty.
Elizabeth Hait was not imbecile. The bill does not place the case upon that ground. The decided weight of the evidence is against it. Some of the witnesses do indeed express that opinion, but the reasons for their opinions are, in many instances, far from satisfactory; and in regard to a number of them their testimony applies to a period long subsequent to the date of the assignment. It is not designed to review the evidence in detail, though it has been examined with much care. The result of the testimony on the question of capacity is very fairly stated by several of the most intelligent witnesses on the part of the complainant.
Hr. Waldo Brown was her near neighbor and family physician for twenty years previous to her death, and was on terms of friendly intimacy with her. He says, “I think she was on a par with women in general, not deficient, or remarkable.”
The Rev. David Magic, who was long and intimately acquainted with Miss Hait, and whose high character, both for judgment and integrity, entitles his opinions to the highest degree of confidence, testifies: “I always supposed she had an average share of intellect; I think her mind was practical. In 1833 I think her mind was as sound as it ever was. *720 I consider that her judgment at this time, and later, was as good about matters with which she was conversant, as that of persons in her situation usually are.” These witnesses were both called by the complainant. Their opinion, sustained as it is by the weight of evidence in the cause, is decisive upon the question of capacity.
All the evidence agrees that Miss Hait was a truly religious woman, of high principle, and strictly conscientious. Considering her situation and circumstances in life, it will be difficult to maintain that her views in regard to this property were not alike conscientious and wise. She lived in retirement in the country. Her habits of life were simple. Her means were fully adequate to all her wants. A considerable portion of her income was devoted to religious and charitable purposes. She had no near relatives dependent upon her. There was no one having a peculiar claim upon her bounty when she died. These considerations show that she may have acted wisely in refusing to enforce her legal claim to this property, as against those to whom she regarded it as justly belonging.
In the light of this testimony it is impossible to regard the assignment from Miss Hait to Colonel Thorn as a bargain and sale for value. The whole evidence impresses upon the transaction a different character. It is obvious that Miss Hait did not regard it in that light. Her conduct was uninfluenced by considerations growing out of the value of the estate. There was, therefore, no occasion or motive for the practice of the fraud charged in the complainant’s bill, and there is no room for the application of the principles of equity relative to constructive frauds.
The case presented by the evidence is simply this. Elizabeth Hait, whose title to this property is sought to be established, never claimed this property as her own. She alleged it to be justly the property of others. She refused to unite in a suit for its recovery. She refused to receive for herself any price for its transfer. She refused to assign it to her relatives while living, or to bequeath it to them by her will. She assigned it to Colonel Thorn without a far *721 thing’s consideration paid to herself, with full knowledge of her rights; she acquiesced in that assignment during the remainder of her life, without questioning its validity, or claiming that she had been defrauded in the transaction. And now, after a lapse of twenty years, this court is asked to set aside that assignment as a fraud upon Miss Hait, and restore the property to her relatives.
There is no principle upon which, under such circumstances, a court of equity can or ought to interfere. Miss Hait, having capacity to act for herself, disposed of the property as she deemed right. That disposition she never sought to disturb. This court ought not to disturb it at the instance of others. _
The allegations of the bill in regard to the existence of fraud, actual or constructive, are not sustained, and upon this ground the bill ought to be dismissed.
So far as the decision of this case is concerned, it is perhaps unnecessary to express any opinion upon the remaining issues made by the pleadings. But to guard against any misconception of the views of the court, and that the parties may have the benefit of an opinion upon all the points in controversy, the remaining questions will be disposed of. Without discussing the principles involved, the grounds of the opinion will be briefly stated.
Third. The defendants are called upon- to account for moneys, which the complainant claims to be due from the estate of William Jauncey to the estate of Elizabeth Hait. The bill seeks to recover not moneys in the hands of the executor, but moneys which have been paid over by the executor to Herman Thorn, or which have been received by Herman Thorn with the executor’s consent. In brief, the object of the bill is to recover money to which the complainant is entitled, and which the executor of William Jauncey has unlawfully and wrongfully paid to Herman Thorn.
These moneys, it clearly appears, were all paid over by the executor to Thorn, or were permitted by the executor to be received by him, under a final decree of the Court of Chancery of the State of Hew York. That decree was made *722 in two causes pending in that court, upon bills filed to settle the title to'the very property in question in this case. To those bills, the complainant and defendants in this cause, or those whom they represent, were all parties.
Of the subject matter of those suits, it is admitted that the Court of Chancery of the State of Uew York had full jurisdiction. And the decree of that court is final and conclusive upon the rights of the parties, here as well as there, unless it can be shown affirmatively by the complainant either that the decree was obtained by fraud, or that the court had no jurisdiction over the person of Elizabeth Hait. The other parties were properly before the court.
The question is not whether the instrument upon which the decree may have been founded was fraudulent, but whether the decree itself was procured by fraudulent means. This court will not look back of the decree of another court to inquire into the merits of the case, if there was no fraud in the procurement of the decree. Uor is it at all material to the present inquiry, whether the decree was obtained by consent, or by a decision of the court upon the points in controversy. The conclusiveness of a judgment upon the rights of parties does in nowise depend upon its form, or upon the fact that the court investigated or decided the legal principles involved. A judgment by default or upon confession is, in its nature, just as conclusive upon the rights of the parties before the court, as a judgment upon demurrer or verdict.
So far as regards the conclusive effect of the decree of the Court of Chancery of Hew York, the whole inquiry is whether Elizabeth Hait was properly before that court or not. Upon the record it appears that she was. She appeared by her solicitor. He consented to the decree. The decree is valid upon its face. To avoid its conclusive operation, the complainant must show that the solicitor had no authority to appear for her. The presumption is in favor of his authority. It was anciently held that the party was concluded by an appearance, though entered without authority, and could not be relieved against it even in the court in *723 which the judgment was entered. The modern rule is otherwise, but all the cases agree that the want of authority must be shown. 1 Keble 89; 1 Stran. 693; Denton v. Noyes, 6 J. R. 296; Den v. Hendrickson, 3 Green 102; McKelway ads. Jones, 2 Harr. 245. Nor is it a material point of inquiry whether the solicitor exceeded his authority, or departed from the instructions of his client. If he was the solicitor, the party was in court, and the decree is binding.
There is no evidence whatever in the cause that George W. Strong, the solicitor, by whom the appearances were entered and consent to the decree given in the name of Elizabeth Hait, appeared without due authority; on the contrary, the evidence is very explicit that the written authority for the solicitor to appear in both the suits were presented to Miss Hait for signature by Mr. Griffin. They were read over to her. She read them carefully herself. Their contents and the object for which they were intended were fully explained. She signed them in the presence of Mr. Griffin, and he became the subscribing witness. This evidence is uncontradicted. Miss Hait was not only a party to the suits with full knowledge of their existence, but regularly appeared by her solicitor duly authorized ; she is, therefore, concluded by the decree.
In regard to the estate of John Rutherford, the case is, if possible, still stronger against the complainant. He refused to take the responsibility of paying any part of this residuary estate until the rights of the parties should be established by a competent legal tribunal. Suits were commenced against him by both the claimants. He appeared to both suits, and submitted himself to the decision of the court. He paid over the money only under the order and direction of the court. The court had jurisdiction. The decree was perfectly regular. The necessary parties were all before the court. There is not the least reason to believe that he suspected any fraud, or that he participated in it. As to him and his estate, the decree would be a full protection, even though the appearance of Miss Hait were *724 entered without her authority. Had a bill of equity been filed in the name of Miss Hait, for the recovery of the property, a decree obtained, and the money been paid over by the executor in obedience to the decree, the executor would be protected though the action of the solicitor were unauthorized.
It is material to observe that the object of this bill is not to enforce the decree of the Court of Chancery of New York against a citizen of this state. That might present the question in a different aspect. The decree of that court has been fully executed. The money was paid over by the executor in obedience to it. The effort now is to hold the executor and his estate responsible, in the absence of all fraud on his part, for complying in good faith with the decree of a court whose behests he was bound to obey. That decree still stands onreversed and in full force. To make a decree in this court not only in direct contravention of that decree, but holding the executor and his estate liable for his obeying it, would be an alarming novelty in the administration of justice, and alike unsupported by equity or precedent.
Fourth. In the absence of satisfactory proof of the imbecility or mental incapacity of Elizabeth Hait, lapse of time is also a fatal objection in equity to the relief sought by the complainant’s bill.
The assignment alleged to be fraudulent was executed on the 27th of March, 1833. Elizabeth Hait died on the 9th of March, 1845. The original bill in the cause was filed on the 4th of March, 1847, fourteen years after the commission of the alleged fraud. A part of this delay is accounted for. But for a large portion of this period Elizabeth Hait was in life, and in the possession of her mental faculties. That she chose to acquiesce in the alleged wrong, rather than incur the vexation and hazard of litigation, is no answer to the objection. There must be reasonable diligence to call into action the powers of a court of equity. The delay may occasion a greater wrong to the defendant than could be occasioned'by the alleged fraud. It was held by the *725 Court of Appeals, in Doughty v. Doughty, 3 Halsted C. R. 650, that it is not reasonable diligence for the party, when there is no disability and no impediment to the vindication of his rights, to lie passive for twelve years, and to call on a court of equity for aid, when the lapse of time and his own laches may have deprived his adversary of the means of defence.
Asa Whitehead, W. L. Dayton and G. Wood, of N. Y., for appellants.
P. D. Vroom, W. Pennington and Chas. Connor, of N. Y., for defendants.
The fact has already been adverted to, that the subscribing witness to the assignment has long been dead, and that a large portion of the evidence in support of the charge of fraud rests upon the testimony of witnesses who detail from memory conversations held, and expressions used, more than eighteen years before, and that, too, in regard to matters in which the witnesses had no particular interest, and to which, so far as appears, their attention was not specially directed, lío circumstance could more strongly illustrate the wisdom of the principle of equity that stale claims are not favored.
The general rule in equity (as well as at law) is, that persons suing in autre droit are not reponsible for costs. An executor or administrator, complainant in equity, will not be ordered to pay costs unless the suit be clearly groundless or vexatious. Exec’rs of Getman v. Beardsley, 2 J. C. R. 274; Goodrich v. Pendleton, 3 J. C. R. 520. Costs in this case ought not to be allowed.
I do therefore most respectfully advise his Honor, the Chancellor, that the complainant’s bill be dismissed, without costs.
Henry W. Green.
January 24th, 1854.
The opinion of the Court of Appeals, affirming the decree of the court below, was delivered by
Potts, J. Elizabeth Hait’s administrator filed his bill in *726 chancery against the defendants, to recover a distributive share of an alleged residue of the personal estate of William Jauncey, deceased. The defendant Thorn answered the bill, (1,) denying that there was any residue of said estate undisposed of by the will of Jauncey ; (2,) setting up that if there was such residue Elizabeth Hait had made, executed, and delivered to 'Thorn, in her lifetime, a legal, valid, and operative assignment of all her interest in it; (3,) that said interest, so assigned, had been paid over to Thorn, under and by virtue of a decree of the Court of Chancery in New York, which decree remained in full force, and was final and conclusive between the parties; and (4,) that the complainant’s claim was barred by the statute of limitations.
A replication was put in, a number of exhibits made, a large amount of testimony taken; and after hearing, the Court of Chancery decreed :
First. That the bequest of the residuary estate in the will of William Jauncey, conveyed to the legatee, not a vested, but a contingent interest only; that his attaining the age of twenty-one was a condition precedent to the vesting of the legacy; that by the death of the legatee before twenty-one, the legacy lapsed, and as to that portion of his estate William Jauncey, the testator, died intestate, and consequently that Elizabeth Hait, the complainant’s intestate, was entitled to a distributive share of the residue as one of the next of kin of the testator.
Second. That the assignment from Elizabeth Hait to Herman Thorn, the defendant, was not a case of bargain and sale for value, but was made upon other than pecuniary con- • siderations; was not obtained by fraud or imposition on the part of Thorn; nor was Elizabeth Hait of imbecile mind; but that the same was a legal and binding conveyance in law and equity.
Third. That the decree in chancery in New York set up by Thorn in bar, is final and conclusive upon the rights of the parties here as well as there.
Fourth. That the lapse of time in this case is a fatal *727 objection in equity to the relief sought by the bill; and that the complainant’s bill be dismissed without costs.
The complainant appeals upon the three last points; and the defendant Thorn, by his counsel, insists that the court below erred upon the first point.
1. The first question, therefore, to be considered, is the construction of the bequest of the residue, in the will of William Jauneey.
William Jauneey, the testator, was a gentleman of large wealth, residing in Hew York. He had survived his brother John and his sister Mary, and inherited their property. Mrs. Thorn was an illegitimate daughter of John. Her father died in her infancy, commending his child to the care of his brother William, but leaving no will. She was adopted as a niece by William, and brought up by him ; mai’ried Mx\ Thorn in 1810, contrary to the wishes of her uncle, and though her uncle never became reconciled to her husband, at least up to the time of making his will, yet she and her family lived in the same house with him to the time of his decease. She had several children before Mr. Jauncey’s death. Jauneey had no relations nearer than first cousins, of whom Elizabeth Halt was one. These cousins (Mrs. Thorn being an illegitimate child) were his next of hin. His will is dated May 28th, 1825. He died September 19th, 1828. Mary Rutherford, who is made a defendant, is the executrix of John Rutherford, deceased, who was the surviving executor of William Jauneey.
Jauneey, by his will, gave all his estate, real and personal, to his executoi’s, “ for the uses and purposes thereinafter mentioned — that is to say, to receive rents, dividends, payments on exchequer bills, and renew the same, but not to sell his property in Hew York, or any part thereof, or to transfer his stocks, or any part thereof, until the period or periods thereinafter mentioned for the performance of the matters therein directed to be done.” He directed the trustees “ to pay to his niece, Mrs. Thorn, for life, to her separate use, ¿62000 sterling, annually, and for the maintenance and education of her children, till the youngest should *728 attain full age, £500 sterling, annually.” He gave a house and lot to Mrs. Thorn for life, with remainder in fee to her daughter Angelina, if living — if not, to her son James, if living — if not, then to her other children. He gave certain parcels of real estate in fee to William Jauncey Thorn, her eldest son, and certain other parcels in fee to her son, James Jauncey Thorn, adding to each devise, “ that the rents of the property be received by the trustees for the general purposes mentioned in this will, until the devisees shall arrive at the years of twenty-one.” He bequeathed other legacies to four younger children of Mrs. Thorn, “ when he (or she) arrives at the years of twenty one.” And to each of the other children, “ on his or her arriving at the years of twenty-one,” £5000 sterling. He gave to Mary Hait and Elizabeth Hait, £300, N. Y. currency, annually, for life. He gave his furniture, plate, horses, carriages, cash in his house aud in bank, &c., to Mrs. Thorn, to have possession immediately on his decease, and gave her all his bonds. Then follows the residuary clause, out of which this controversy originates, to wit:
“ I give and bequeath all the residue and remainder of my property, both in England and America, of every kind and description whatever, to the said William Jauncey Thorn, when he arrives at the age of twenty-one years, to him and his heirs forever.”
He subsequently says: “ It is my most particular desire and injunction, that the said William Jauncey Thorn should, after my decease, designate himself William Jau/ncey, without any additional name.” The same as to James, with a request that an act of the legislature might be applied for to make it regular. He restrains his executors from collecting any notes or obligations held by him against Rev. Benjamin Hait, and declares them void. Gives £5000 to each of the future children of Mrs. Thorn; appoints William Jauncey Thorn and James Jauncey Thorn, trustees of these last legacies, when they, are both arrived at the years of twenty-one; and makes other provisions not necessary to notice.
*729 William Jauncey Thorn, whose name was changed by an act of the legislature of New York to William Jauncey, died before he arrived at the age of twenty-one. The question is, was the residuary bequest a vested or a contingent legacy; that is, did it vest absolutely in William in his lifetime ; or was it merely a bequest to him upon the contingency of his arriving at twenty-one? If the former, his personal representatives take it — if the latter, it goes to the heirs-at-law of the testator, of whom Elizabeth Hait is one.
In construing wills, the primary rule is that the intention of the testator is to govern ; and to ascertain this intention, we are to look first to the language used by the testator himself, and if this is ambiguous, or susceptible of different constructions, or if carried out would defeat the intention as clearly deducible from other parts, or from the whole scope of the instrument, the intention thus manifested will control the particular words.
We look, then, first to the language used by the testator himself to express his intention. The words are, “ I give and bequeath, &c., to the said William Jauncey Thorn, when he arrives at the age of twenty-one years, to him and his heirs forever.”
Now it has been repeatedly held, and seems at this day to be the settled law, that where the bequest made to a legatee is in these, or words of similar meaning, without being controlled by the context of the will, they imply a condition precedent, to wit, that the legatee live to that age; and consequently the legatee does not take a vested interest in the legacy until twenty-one. I give and bequeath to A. B., “at the age of twenty-one” — or, “if he arrives at twenty-one” — or, “provided he lives to be twenty-one” — or, “in ease of his arriving at twenty-one” — or, “when he arrives at the age of twenty-one” — have all been held to be contingent legacies.
In Small v. Dee, 2 Salk. 415, the bequest was of one hundred pounds apiece to two children of J. S., at the end, of ten years next after the testator’s death. The legatees died before the expiration of the ten years, and Lord Cowper *730 held the legacies to be extinct, and said that “ whenever the time is annexed to the legacy, and not to the payment of it, as in this case, if the legatee die before the day of payment, the legacy is lapsed.”
In Onslow v. South, 1 Eq. Cas. Ab. 295, pl. 6, the bequest was as follows: “I give to J. S., now under the custody of R. D., two thousand pounds at the age of twenty-one years, to be paid by my executors in England.” The legatee died under twenty-one, having first bequeathed the legacy to the defendant, South; and it was held by the Lord Chancellor that the legacy did not pass to the defendant, because J. S.’s interest in it was not vested, but contingent.
In Cruse v. Barley, 3 P. Wms. 20, the testator’s bequest was to his eldest son, C. B., two hundred pounds, at his age óf twenty-one. C. B. died under twenty-one;, and the court held that the legacy never vested in him, as the age was annexed to the gift, and not to the payment, and consequently his personal representative could not be entitled to the money.
And so it has been repeatedly held that a legacy given to A. “ if” he attain the age of twenty-one years, will not vest at an earlier period; and that if the legatee die before twonty-one, the legacy lapses. 1 Roper on Legacies 567.
So, also, where the bequest was to the legatee provided he should attain the age of twenty-one, it has been held that until twenty-one the legacy does not vest. Athinson v. Turner, 2 Athyns 41, is a case of this class. There the bequest was of a certain part of a joint stock in trade to the legatee, provided he should attain the full age of twenty-one, with remainder over if he did not live to that period; and the legatee having died under twenty-one, the question was whether his administrator was entitled to the profits which accrued between the. death of the testator and his own, and-which depended on the circumstance whether or not he took a vested interest in the legacyduring his minority, and the court held that he did not.
In Young v. Mackintosh, 13 Simons 445, the bequest was of three thousand pounds to Y. for life, and at her death to *731 be equally divided between her two children, should they have. attained the age of twenty-one ; and this was held to be a legacy contingent on the children attaining that age.
So in Elton v. Elton, 3 Atkyns 504, the bequest was to A. E. in ease, she married with consent, &c. In Knight v. Knight, 2 Sim. and Stuart 490, it was to each of the daughters and sons of T. K., lawfully begotten, as soon as they attained the age of twenty-one years; and in both cases it was held that the legacies were contingent.
There is one case in which it is said that the word “ when ” indicates only the intention of the testator to fix the time at which the legatee is to have possession — and is not to be held as interposing a condition precedent to its vesting in him. May v. Wood, 3 Bro. Ch. C. 471.
But the weight of authority is undoubtedly the other way, and in Hanson v. Graham, 6 Ves. 239, Sir William Grant, referring to that ease, repudiated the doctrine there held, as unsupported by authority.
Going back to the civil law, from whence many of the rules of construction in these cases are derived, we find it laid down that the words “ if” and “ when ” are of the same import when speaking of an uncertain event. Both are words of condition annexed to the very gift of the legacy, when unexplained by the context of the will. Digest, Book, 36, tit. 2, § 22; Roper and White 570.
In Stapleton v. Cheales, Pr. in Ch. 317, a case long anterior to May v. Wood, it was agreed that if a legacy be given to a person when he shall attain the age of twenty-one, and the legatee die during minority, the bequest is lapsed, and shall not go to the executors or administrators; and this proposition, Sir William Grant said, in Hanson v. Graham, he did not find contradicted by any authority.
In Goss v. Nelson, 1 Burrows 227, Lord Mansfield said, "In legacies there is a known distinction between the time being annexed to the substance of the gift, or to the payment. If complete words of gift direct the executor to pay, the other words only fix the time of such payment; and then the legacy vests and is transmissible, though the legatee should *732 die before the day of payment, as a legacy given to be paid at twenty-one.’ But if the time is annexed to the substance of the gift, as a legacy ‘if’ or ‘when’ he shall attain twenty-one, it will not vest before that contingency happens.”
Lord Hardwicke recognized this as a rule in Fonnereau v„ Fonnereau, 3 Athyns 645. There the bequest was of one thousand pounds to C. F., when he should attain the age of twenty-five; but the testator having directed the money to-be put at interest, and the interest applied to the education of the legatee, and part of the principal to be expended for his benefit, by way of an apprentice fee, Lord H. held that these subsequent words controlled the word when, and clearly indicated that the intention was to give a vested legacy.
In Leake v. Robinson, 2 Merrivale 385, the master of the rolls, Sir William Grant, said, “If I give to persons of any description when they attain twenty-five, or from and after their attaining twenty-five, is it not precisely the same thing as if I gave to such of those persons as.should attain twenty-five ? None but a person who can predicate of .himself that he has attained twenty-five can claim anything under such a gift.” And see 1 Jarman on Wills 764; 2 Williams on Ex’rs 1052 ; Ward on Legacies 172.
Sheppard’s Touchstone 454, lays down the rule thus: “ If one give to W. S. twenty pounds when he cometh to twenty-one years of age, or at his age of twenty-one years, and he die before he come to the age of twenty-one years, in this case his executor shall not have the legacy; for the attainment of the age is of the substance of the gift.”
The same general rule of construction has been sanctioned in several cases in this country. Patterson v. Ellis, 11 Wend. 260; Gregg v. Bethea, 6 Porter (Alabama) 9; King v. Crawford, 17 Sergt. and Rawl. 118; Moore v. Smith, 9 Watts 403; Sweet v. Chase, 2 Comstock 80.
There are exceptions to this rule, but I am not able to see that this case is within any of them. Nor can I discover anything in the will which indicates tha.t the testator meant this bequest to be a present unconditional gift, for it is *733 «loar he did not mean that payment, merely, was to be postponed until the legatee arrived at twenty-one; that event was deferred for a much longer time, to wit, until all the other legacies and annuities were paid which were charged upon the estate; and therefore, by the use of the words, I give tlie residue when he arrives at twenty-one, he must have, intended to refer to the substance of the gift, and not the time of payment. It is quite probable that the possibility of the legatee’s dying under twenty-one did not occur to the mind of the testator when he made this will. It is quite probable that if it had, he would have made some provision for it. But how is it possible for us to know what that provision would have been? If he did not think of it, then he could have had no intention respecting it. If ho did think of it, then he did not intend to make any further or other distribution of this residue than he has made. In either case, all that remains for us is to declare the result under the rule of construction applicable to the clause as we find it, and that is, that the legacy was contingent, to vest only on condition that William Jauncey Thorn arrived at twenty-one; and as he did not live to that age, the legacy lapsed; as to this residue, the testator died intestate, and his next of kin became entitled to it. So that the ruling of the Court of Chancery on this branch of the case does not stand in the appellant’s way, if he is right upon the points upon which he grounds his appeal.
Second. We come, then, to consider the first error alleged by the appellants in the decree below, which is, that the decree establishes the assignment made by Elizabeth Halt to Thorn in 1833; whereas they insist the same was fraudulent and void, and ought to have been decreed so to be.
A brief recurrence to the prominent facts which form the history of the case will aid in the examination of this question.
William Jauncey, the testator, died September 19th, 1828. Soon afterwards (in 1829) the Thorn family went to Europe and resided there until 1845 or 1846, occasionally visiting this country during the time. William Jauncey Thorn, *734 (his name having been changed to William Jauncey by an act of the legislature of New York) died in England, November 18th, 1830, not having arrived at twenty-one; and in February following, James A. Hamilton, of New York, administered on his estate. In July, 1831, five of the first cousins,, next of kin to the testator, to wit, Eliza Smith, Ann Masters, William S. Chapman, Robert H. Chapman and Henry Wilkes, filed their bill in chancery, in New York, against Herman Thorn, John Rutherford, the testator’s executor, Elizabeth Hait and James A. Hamilton, administrator of William Jauncey, the legatee, to recover their share of the residue of the testator’s estate, on the ground that the bequest had lapsed by young Jauncey’s decease. ElizabethHait, refusing to. be made a complainant, was made a defendant; and about the same time, Hamilton filed a cross-bill, claiming the residue as the personal representative of youngJauncey, on the ground that the legacy had vested in the deceased in his lifetime, and did not go to the next of kin. In this state of things, some correspondence took place between Mr’s. Thorn and her husband and Miss Hait — the former urging upon Miss Hait the injustice of the claim set up, soliciting her to be guided by Mr. Hamilton’s advice, and suggesting the hope that a settlement of these claims might be effected by a compromise. This correspondence extends-from August, 1831, to February, 1832. Miss Hait’s letters are not in evidence. On the 15th of June, 1832, Miss Hait made her will, in which she does not mention any interest-in, or claim to, any part of the estate of Jauncey. On the-8th of December, 1832, she made an assignment of all her interest, as one of the next of kin, in the estate of William Jauncey, (the testator,) saving her own legacy, to her thi’ee nephews, William J., Edwards and Benjamin Hoyt, with authority to take all lawful measures to recover and retain it to their own use, for the consideration of one dollar, and love and affection; but she soon after reclaimed this paper. In 1833, negotiations for a compromise were set on foot between Thorn and the five cousins who filed the bill in chancery, and a compromise was effected by the payment of two- *735 hundred and ten thousand dollars. On the 27th of March, 1833, Miss Halt assigned all her interest in the estate, saving her legacy, to Mr. Thorn, for one dollar and other good considerations ; and authorized Rutherford, the executor, to pay over to Thorn her distributive share; and at the same time, Mr. Thorn gave her his bond for six thousand dollars, to be paid when the residuary estate should be settled or paid over to him. At the foot of the bond is added, “two thousand for Benjamin, two thousand for William, two thousand for Edwards.” The assignment was re-acknowledged May 3d, 1833, in the presence of Francis Griffin, who signed it as a witness; and at the same date the six thousand dollars was paid over to Miss Hait, as appears by her receipt, and she signed a written authority to Thorn, to employ a solicitor to appear for her in the suit in New York, with directions that said solicitor should follow in all respects the lawful directions of said Thorn in relation to said suit. On the 18th of June, 1834, a decree was made in the suit in New York, settling the matters in difference in said suit. On the 9th of March, 1845, Elizabeth Hait died, and this suit was commenced by her administrator Nov. 14th, 1847, to set aside the assignment, &c.
The assignment by Miss Hait, then, was executed in 1833. The allegation is that she was a woman of weak mind, incapable of transacting business, and easily imposed upon; that the paper was procured by threats and undue influence; was not voluntary; was executed in ignorance of the nature and extent of her rights, and under false representations respecting them; and under a delusion produced and encouraged by Thorn, as to the nature of her claim and the will and intention of Mr. Jauncey, the testator.
I. As to her competency in 1833, the evidence is that she was about seventy-five; was a lady of retired habits; after the death of her sister in 1828, lived very much alone with her hired people; carried on her farm with the aid of a hired farmer; consulted her neighbors frequently about her affairs; usually took good advice, and made a judicious selection of her advisors and assistants; and was careful and *736 particular in dealing. Witnesses differ in opinion as to the strength of her mental powers, some considering her, after her sister’s death, as having become enfeebled in intellect; others that she was as capable as women generally; and others again considering her of excellent mind and sound judgment. She was generally cheerful, but easily excited and distressed; afraid of law and lawsuits; in matters of business, acting within a very narrow sphere, but capable of transacting that with which she was familiar. There is nothing in the evidence as to her general habits or particular conduct which warrants the belief that she was imbecile. She was somewhat eccentric, perhaps; had not much self-reliance or firmness, but she was manifestly under the constant influence of strong religious feeling, and a high sense of moral obligation, and disposed to do what was right; and the distress she at times exhibited about this claim against the Jauncey estate, was manifestly occasioned principally by the apprehension that she might, by an error in judgment, do an act of injustice to others. Her nephews, the Messrs. Hoyt, at whose instance or for whose benefit this suit was brought, did not believe her incompetent to deal with this claim, for they took from her an assignment of it, only a few months before she executed this assignment to Thorn ; and in all their transactions with her they treated her as competent. It is very clear that this ground of objection to the assignment is not maintained. Then,
II. Was the assignment to Thorn, procured by threats or undue influence? It is charged in the bill that Mr. Thorn threatened that unless she executed an assignment of this claim he would commence legal proceedings against her and compel her to relinquish it; that she should be taken to New York, and subjected to the consequences and annoyances of a law suit; that his manner and conversation in relation to it were threatening and overbearing, and calculated to intimidate and alarm her; and that she executed the assignment under the influence of these threats.' This is expressly denied by the answer. Upon this subject we have the testimony of Mr. Frazee, Miss Hait’s farmer, Mrs. Brown, who *737 did her housework, and Hr. Brown, who was sent for as a witness. Fra zee says Mr. Thorn told her, “ if she didn’t sign, he would have to compel her to go to the city of New York, and there be obliged to sign off” — and that this seemed to worry her. Thorn said something about a law-suit — that, “ if she didn’t sign off, he would carry it as far as the extent of the law ; ” and the dread of a law-suit worried her. Mrs. Brown was present. She says Mr. Thorn threatened to take her to New York, to compel her to sign off, if she didn’t sign ; and this alarmed her. Frazee declined witnessing the papex’, and Dr. Brown was sent for, and came. Miss Hait said, here is Mr. Thorn with papers; wishes me to sign off my claim to the Jauncey estate; asked Dr. B. what he thought she ought to do; he advised her not to do it, but to wait a day or two. Miss Hait said she thought she had better sign it, as, by that means, she would get rid of it, and get rid of trouble. She said Mr. Thorn was from a far country, had come to settle it, and she would have to go to New York to sign her name to some instrument, unless a settlement could be had here. Mr. Thorn assented to what Miss Hait said. The doctor says : “ I am not aware that he threatened to take her to New York ; he said she would have to go there.” This is the substance of the proof of threats. Now it is to be remembered that the claim of Miss Hait was a disputed claim; her right to any part of the Jauncey estate depended upon the construction of the will. It was in litigation in the Court of Chancexy of New York. Miss Hait was a defendant in the bill and cross-bill filed in relation to it. She had, as yet, taken no step towards assorting her claim in these suits. Thorn was endeavoring to effect a compromise of these suits, no doubt on the best terms he could; and it was perfectly natural and proper for him to tell her that, unless she would release her right, the question must be settled in the law-suit then pending, and she would have to go to New York to attend to it; and probably this was the amount of what was said. The testimony shows that she was inclined to execute the release, to save further trouble, and was only prevented at the time from doing so by the ad *738 vice she received ; and, although we have not got the testimony of the subscribing witness to the assignment she executed, and do not know what passed at that time, yet we have Griffin’s testimony, before whom she re-acknowledged the instrument more than a month afterwards, from which it appears that she then expressed her perfect satisfaction with what she had done, and her wish that Mr. Thorn should have the full benefit of the assignment. Taking the testimony altogether, I think there is no well-founded reason to believe that the assignment was extorted from Miss Hait by threats or undue influence.
III. Another general ground alleged in avoidance of this assignment is; that it was obtained by fraudulent misrepresentations as to the amount of the property in dispute, and as to the validity of her claim to, and her equitable right in it.
There is evidence that, on one occasion, at least, in the course of his interview with Miss Hait, Mr. Thorn said, in the presence of Frazee Haines, the amount of her claim would not exceed seven thousand dollars; and that he also told her, in the presence of Mrs. Brown, that it was not worth a great deal to her. It is also proved that Mr. Hamilton told her, on his first visit to her, it was not much. But there can be, I think, no doubt that Miss Hait either did know, or had abundant means of knowing that the amount of this residue was very large. Dr. Brown, with whom she was in the habit of advising, says he understood the amount was large. Mr. Rutherford, the executor, who knew all about it, lived where she could reach or communicate with him' easily; she did consult with him in relation to the assignment, and he was not the man to conceal anything from her which she had a right to know ; her nephews were business men, and doubtless well informed on the subject. They were in frequent intercourse with her in relation to this very claim. She had been for many years intimate in the Jauncey family, and must have had at least a general knowledge of the extent of the estate — and amid such abundant means of information, it is incredible that she should have remained in ignorance of the fact that the portion of *739 the estate in litigation was very large. It is proved by a number of witnesses that on various occasions, after she had executed the release, she spoke in a manner which showed it was a painful subject of reflection, and that she complained of Mr. Thorn as a pompous man, coming in great state and disturbing the quiet of her retired life; expressed doubts whether she had done right in executing the assignment ; said she had been forced to do it; that she had intended it for her nephews ; that she was sorry she had done it • that it was an act of injustice, but she was frightened when she did it, and she regretted it, and expressed a dislike for Mr. Thorn ; but it does not appear that she ever complained that she had been deceived by any representations made to her in regard to the amount of the property. And Mr. Griffin expressly swears that when he called with Mr. Thorn to take her re-acknowledgment of the paper, she was informed of the terms upon which the other parties had been compromised with ■ that the estate was spoken of as very large, and that there was nd concealment of anything from her. I am not able, therefore, to see that there is any just ground for the belief that the assignment was procured by means of fraudulent representations as to the value of the subject with which she was dealing.
Was it procured by misrepresentations as to her legal or equitable right to the money ? There is no doubt that the Thorns did make efforts to impress Miss Hait with the belief both that her claim was unfounded in law, and was contrary to equity and good conscience. The letters which are in evidence show this — and it abundantly appears that they represented, and caused it to be represented to her, that Mr. Jauncey never intended his next of kin should have the property ; that he always meant and intended it for Mrs. Thorn and her children ; that if he had not provided for the contingency of the death of William under age, it was an accidental omission ; that the claim set up by the next of kin, was unjust, unconscientious and wicked ; and they appealed to the high sense of integrity, and the strong religious feelings of Miss Hait, upon these considerations, to *740 abandon it on her part. They also represented to her, that if ever the claim was established, it must be by a long and expensive litigation, and they appealed to her instinctive dread of law, and law-suits and trouble. But admitting all this, was there bad faith, or dishonesty or fraud in it? Does it require any extraordinary charity to suppose that the Thorns believed all this? The construction of the will was a fair question for examination, and we have seen that upon just such a question there has been at least some contrariety of opinion in the courts. There was nothing of fraud in frankly saying to Miss Hait that her right would be contested, and strenuously contested. And as to the matter of intention, there may be a strong probability the Thorns were right about it so far as this, that if the testator had anticipated the event that occurred, he would have secured, in some way, this residue to the Thorn family. They no doubt honestly believed it was not his mind nor will that it should be wholly diverted from them; and if, without misrepresenting or concealing any facts in relation to the subject within their knowledge, they so persuaded Miss Hait, it can hardly be set up in avoidance of her action founded on that belief. Besides, Miss Hait had the same opportunities of ascertaining what the true construction of the will was, that they had ; the other claimants had taken legal advice, had employed eminent counsel, and she might have done so. She knew, too, at least at the time she re-acknowledged the instrument, if Mr. Griffin is correct, that the other claimants had sacrificed two-thirds of their claim to their doubts of final success— and it may be that what to them was a mere question of expediency presented itself to her mind as a question of conscience. Upon the whole, I think we cannot say the assignment is void for this.
IY. But then it is insisted here was gross inadequacy— a sale for six thousand dollars of an interest worth at least fifteen times the amount — a sale for six thousand dollars, when she might have compromised it for forty thousand dollars. Undoubtedly if this transaction is to be considered as a matter of bargain and sale, here is a gross inadequacy *741 of consideration; such inadequacy as raises a violent presumption of fraud, deception, ignorance, or imbecility. But was it such a transaction ? The question turns entirely upon the light in which Miss Hait herself regarded it.
Now it is very manifest that, from first to last, Miss Hait never dealt with this matter as one of pecuniary interest to herself. She had enough, and to spare; retired from the world with sufficient for her wants and her charities, she had no desire to accumulate a superabundance of wealth. But she had nephews, and they wanted it. She was attached to Mrs. Thorn, and Mrs. Thorn urged her claim to it. The question which agitated Miss Iiait’s mind was to which of these parties she should give it. The idea of selling her interest, if she had any, in the estate, never seems to have entered her mind; and whatever doubts she may have had as to the justice of her claim, weighed, of course, in favor of Mrs. Thorn. I think it clear she had doubts about it. Such is the impression the letter of Mrs. Thorn, in answer to Miss Hait’s, conveys. Such would seem to be the probable inference dedueible from her refusing to bo a party to the bill in chancery — independent of the testimony of Griffin. Indeed, if she was free from doubt upon the subject, she was probably the only one of the heirs who was so.
She yielded, however, in the first instance, to the solicitations of her nephews. The assignment to them, upon its face, was a voluntary gift of the whole interest, for “ their sole use, benefit, and behoof forever.” Having subsequently reconsidered and reclaimed this, she next executed this assignment to Thorn. This, also, upon its face purports to be a voluntary gift. It is true Mr. Thorn paid her six thousand dollars, but this was, as appears upon the face of the transaction, not a consideration paid to her for her use, but a sum of money stipulated for, in order that she might make it a voluntary gratuity from her to the nephews, to satisfy them. Upon the whole case the fact stands clear of doubt, that the old lady throughout desigued this interest of hers as a gift to one or the other of these parties, and that she never purposed to appropriate it to her own use. The two assign *742 ments show that this was so; and all the testimony as to her declarations from the date of the last assignment down to the close of her life, confirms it. For she never complained that she had sold the claim for too little; her anxiety, her doubts, and her trouble were about the question whether, having promised to give it to the boys, she had done right in giving it to the Thorns.
Such seems to be the aspect of the case independent of the testimony of Griffin. His position in reference to the cause has been the subject of remark. He was the solicitor of Thorn and Hamilton in the, suits in New York. He prepared the defendant’s answer in this suit. But his veracity is not impeached. His testimony is important, for he is the attesting witness to the re-acknowledgment of the last assignment. He visited Miss Hait, in company with Mr. Thorn, on the 3d of May, 1833. He says they went first to Belle-ville to see Mr. Rutherford, and inform him of the assignment having been made by Miss Hait to Mr. Thorn. Rutherford said he had himself conversed with Miss Hait on the subject, and knew it was in aeoordanae with her views and wishes. They went to Miss Hait’s. She expressed the greatest affection for Mrs. Thorn; said she knew Mr. Jauncey intended that Mrs. Thorn and her family should inherit the estate; that when Chapman proposed to her to unite in the suit in New York, she had refused to have anything to do with it, and was surprised that he, a professing Christian, should have anything to do with such a wicked attempt to. divert the estate from Mrs. Thorn and her family. She said J. Edwards Hoyt had represented to her that unless she did something, the Chapmans and the rest would get the whole estate, and Mrs. Thorn would get nothing, and, to obviate this, proposed that Miss Hait should give him her name, and he would litigate the matter at his own expense, and give Mrs. Thorn one-half, or give it to Miss Hait for Mrs. Thorn ; that upon his representation she executed the assignment to the nephews. That soon after, Mr. Rutherford undeceived her as to this view of the case, upon which she had reclaimed and canceled that assignment. That she gave her nephews *743 two hundred dollars apiece to moderate their disappointment ; re-acknowledged the assignment to Thorn, received the six thousand dollars, signed the receipt for it; executed an authoirty to Mr. Thorn to appoint a solicitor for her in the suit in New York, saying it was her wish that he should have the full benefit of the assignment; said she designed the six thousand dollars for her nephews — she wanted nothing for herself, and if Mr. Thorn thought it too much she would take less. And Mr. Griffin further says : “We made use of no misrepresentations or concealment, undue influence nor threats, or no influences, you may say; indeed, none such were necessary, if we had been disposed to use them — for Miss Hait appeared to be as auxious, or rather willing, to carry out the arrangement as Mr. Thorn. The whole conversation was based on the idea that in receiving this six thousand dollars, Miss Hait was giving up to Mr. Thorn a large substantial advantage. There was no concealment of any material fact. The conversation was perfectly full and frank on the whole subject.”
It is very clear, I think, that the transaction in question cannot be considered as a sale. It is rather to be regarded as a voluntary relinquishment to the Thorns of a claim which she considered unconscientious — of an interest which she believed in justice belonged to them.
This assignment was made in 1833, by Miss Hait, at her own house — not without deliberation, for the subject matter of it, and what disposition she should make of it, had long been before her mind. She had talked with her neighbors and friends — had been importuned by her nephews — had spoken with Mr. Rutherford, the executor — and had had previous conferences with Thorn, and correspondence with Mrs. Thorn, in relation to it. The friends who were about her seem generally to have advised her against the assignment. Thorn %vas not in a situation to exercise any peculiar influence over her, for he does not seem, personally, to have had her confidence or favor. She persisted in executing the paper against Dr. Brown’s advice, and sent for another neighbor to witness it when he refused. More than a mouth *744 afterwards, and after she had seen and advised with Mr. Rutherford, she voluntarily re-acknowledged the instrument —received and receipted for the six thousand dollars, and subsequently gave it to her nephews, who accepted it. She lived about twelve years after the transaction, always treated it as a thing settled, and never intimated the slightest disposition to disturb that settlement. She had an undoubted right to do as she pleased with this claim. She exercised that right, and I see no reason for interfering with it now.
Being of opinion, therefore, that this assignment is good and valid, and ought not to be set aside, the decree of the court below should, in my judgment, be affirmed; and, having reached that conclusion, I do not deem it necessary to examine the other questions made in the cause.
Valentine, J. The bill in this case was filed by the administrator of Elizabeth Hait to recover a distributive share of the residue of the personal estate of William Jauncey, deceased, to which it is alleged that the said Elizabeth Hait became entitled as one of the next of kin of the said William Jauncey.
The material issues made by the defendants answer are:
First. That all the personal estate of William Jauncey was disposed, in and by his last will and testament, and that no part thereof did or could vest in the said Elizabeth Hait as his next of kin.
Second. That all the right and interest to which the said Elizabeth Hait had or could have in the residue of the estate of William Jauncey, was assigned by her to Herman Thorn, one of the defendants.
Third. That the share and interest of the said Elizabeth Hait was paid by the surviving executor of the said William Jauncey to Herman Thorn, under and by virtue of a decree of the Court of Chancery of the State of New York; that the said decree remains in full force, and is final and conclusive between the parties.
Fourth. That the claim of the complainant is barred by the statute of limitations, more than six years having *745 elapsed from the time of the payment of the legacy by John Rutherford, the surviving executor of William Jauncey, deceased, before the filing of the bill in this cause.
William Jauncey, of the city of New York, died on the 19th of September, 1828. At the time of his death he was seized and possessed of a large and valuable estate, both real and personal, in England and America. By his will, executed and published in due form of law, having given and devised large portions of his real and personal estate, the testator further gave and bequeathed as follows: “ I
give and bequeath all the residue and remainder of my property, both in England and America, of every kind and description whatsoever, to the said William Jauncey Thorn, when he arrives at the age of twenty-one years, to him and his heirs forever.”
The legatee, William Jauncey Thorn, (having, in compliance with a request of the testator, assumed the name of William Jauncey,) died before he arrived at the age of twenty-one years.
Whether, by the terms of the will, the residuary legacy vested, upon the death of the testator, in the legatee, or whether the legacy was contingent upon the legatee’s attaining the age of twenty-one years, and by his death before that period elapsed, is one of the questions submitted for consideration.
The rule is well settled, that-when the time specified in the bequest is annexed to the payment only, the legacy vests immediately on the death of the testator, the time of payment is only postponed; but when the time is annexed to the gift itself, as when the legacy is given to the legatee at twenty-one, the legacy does not vest until he attains that age; the legacy is given upon that condition, and if the condition be not fulfilled, the legacy never vests.
William Jauncey, the legatee, having died before he attained the age of twenty-one years, the legacy lapsed, and never vested in him, and upon his death the residuary personal estate became and remained undisposed of, and thenceforth was held by the executors of the said testator in trust *746 for his next of kin, and the said Elizabeth Hait thereupon became and was entitled to one-sixth part thereof, she being one of six of his next of kin in equal degree to the said testator.
This leads to the second inquiry, viz.: Whether the assignment made by Elizabeth Hait to Herman Thorn of her interest in the residuary estate of William Jauncey was valid, or procured through fraud or undue influences.
The bill charges (among other things) that at the time of the execution of the assignment, the amount and nature of Elizabeth Hait’s interest in the estate was not made known to her; that she was told her interest was not worth over $5000 or $6000; that it was concealed from her what amount was given to the other next of kin for their interest in the estate; and that she was intimidated by threats from the said Herman Thorn that he would compel her to go to New York to attend a lawsuit and sign off.
The assignment bears date the 27th of March, 1833, and purports to have been executed in the presence of Mathias Brant as subscribing witness; the subscribing witness is dead. It is proved that he was a neighbor of Miss Hait, and on friendly terms with her. The deed of assignment purports to have been re-acknowledged on the 3d of May, 1833, in the presence of Francis Griffin; he has been examined as a witness in this cause. He states that he was a solicitor of Colonel Thorn in two suits pending in the Court of Chancery of New York, in relation to this residuary estate; that on the 3d of May, 1833, he accompanied Colonel Thorn to Miss Hait’s; that the original deed of assignment was then produced by Colonel Herman Thorn, and was re-acknowledged by Elizabeth Hait, at the same time she produced a bond for six thousand dollars, given her by Colonel Thorn, and bearing even date with the assignment, and executed in the presence of Mathias Brant as subscribing witness ; the bond was paid by Colonel Thorn, and the amount was endorsed upon the assignment, and signed by Elizabeth Hait in the presence of the witness; and Miss Hait at the same time executed two other papers, authorizing solicitors *747 to appear for her in the two suits pending in New York, in each of which she is made party defendant. The papers were read over to her, and the contents explained ; she read them herself; she said she was nervous about signing papers; that she was not accustomed to it; and that when she executed the assignment to Thorn she had hoped the matter was at an end, and that she would have no more papers to sign; but if it was necessary, she would sign them, and did sign them in the presence of witness.
Mr. Griffin further testifies that Miss Hait appeared to be a woman of good common sense, and understood what she was about; and that concealment, misrepresentations, or threats of any kind, were not made use of towards her; that .she seemed perfectly willing to carry out the agreement.
A compromise had been, at that time, agreed on between Herman Thorn and five of the next of kin of William Jauncey, by which Colonel Thorn had agreed to pay them two hundred and ten thousand dollars for their interest, being at the rate of forty thousand dollars for each share, and ten thousand dollars for law expenses. This whole compromise and the terms of it were told to Miss Hait, and was the subject of conversation. The whole conversation was based on the idea that in receiving the six thousand dollars she was giving up to Colonel Thorn a large amount of property. The witness also states that his memory was refreshed by a written memorandum of what passed, made on the evening of the same day, after he returned to New York.
In the fore part of Mr. Griffin’s testimony, he says that Mr. Thorn stated to Mr. Rutherford that, he had got from Miss Hait a release and assignment in his favor of all her interest in the residuary estate of William Jauncey, the elder, and had agreed to pay her a consideration therefor of six thousand dollars.
He further says the estate was spoken of by Mr. Thorn and inyself as being very large; no precise figures were named, because at the time I myself did not know the figures, nor, as far as I know, did Mr. Thorn know them.
*748 Frasee Hains testifies that he lived with Miss Hait seven years — from the year 1827 to the year 1834; that he saw Herman Thorn at Miss Hait’s three times in the year 1833 ; he came there the latter part of one week, and was there the next; the next week he was there twice; at one time he stayed two nights.
Before Mr. Thorn came, Mr. Hamilton had been there to see Miss Hait; he had been to see Miss Hait twice, I think, about six weeks before Mr. Thorn came; Mr. Hamilton’s visits were about one week apart; he came there to settle up the estate of Mr. Jauncey; I believe Mr. Hamilton was a lawyer from New York; he came to see Miss Hait at Mr. Thorn’s request; he wanted her to sign off her right to the property of the Jauncey estate; on the first visit he told her she had no right, but the next time he came he found she had a right, and then it was he wanted her to sign off her right; the second time Colonel Thorn came, he wanted her to sign off; she was not willing to sign off this property; she asked him how much property there was; he said there was between six and seven thousand dollars — would not exceed seven ; she refused to sign off; when Colonel Thorn came the third time, he was on the same errand; I think he stayed two nights; he and Miss Hait talked a good deal about signing papers; at first she refused; he told her if she did not sign off he would have to compel her to go to New York and there be obliged to sign off; he said something about a lawsuit, which seemed to worry her a good deal; the dread of a lawsuit seemed to worry her; she said if she had to do it, she might as well do it there as to go to New York; he said if she would sign off he would give her six thousand dollars to sign off.
The testimony of Mr. Griffin is certainly open to comment, and requires strict scrutiny, on the ground that he was the paid attorney of Colonel Thorn, and went with him to the residence of Miss Hait in that capacity, and for the express purpose of becoming a witness to the transaction; he states that in the evening of the same day of their visit to Miss Hait, after he returned to the city of New York, he made a *749 memorandum in writing what Miss Hait said on that occasion, and of her admissions, but says he did not write down very fully what he and Colonel Thorn said preceding those admissions; had he been as careful to preserve their words his memorandum probably would have put that interview in a very different aspect. The bill charges that he aided and participated in the fraud. Mr. Griffin’s testimony may, with propriety, be construed strongly against Herman Thorn; and he says that on their way to Miss Hait’s they called on Mr. Rutherford, and Colonel Thorn told Mr. Rutherford that he had got from Miss Ha,it a release and an assignment in his favor of all her interest in the residuary estate of William Jauneey, the elder, and that he had agreed to pay her, as a consideration therefor, six thousand dollars. Mr. Griffin further states he accompanied Colonel Thorn to Miss Hait’s, to witness the payment of the money; and the conversation was based upon the idea that for this six thousand dollars Miss Hait gave up a large amount of property, which is a very indefinite term; speaking to a person of Miss Hait’s capacity and business transactions through life, six thousand dollars would appear to be a large amount; and Mr. Griffin says no particular amount was named, as he did not know the figures.
Frasee Ilains, a witness on part of the complainant, testifies that Colonel Thorn offered Miss Hait six thousand dollars for her interest in the Jauneey estate, but she refused to accept that sum. Herman Thorn told her the extent of her interest would not exceed seven thousand dollars, and Colonel Thorn stayed at her house two days, importuning Miss Hait, and never left her house until he procured the transfer and assignment of her interest for the consideration of six thousand dollars.
A large mass of testimony has been adduced by Colonel Thorn to prove the transfer was voluntary, and not for a consideration ; the transfer and assignment purport to be for the sum of one dollar, and for divers other good causes and considerations. What other considerations ? Hot for love and affection, surely. For by the testimony of the Rev. Dr. *750 Magie, Miss Hait always spoke of the visits of Colonel Thomas being exceedingly unpleasant to her; she would be much agitated when referring to his visits; she regarded him as a pompous man ; and she frequently and strongly spoke of him-as an intruder into the family.
Dr. Waldo Brown, her near neighbor, refused to be a witness to the transaction, which goes to show what he thought of the transaction at the time; had it been a voluntary surrender or assignment, most assuredly he would not have-refused his signature to the paper.
Colonel Thorn was a man possessing a large fortune, and being assisted in this transaction by two eminent attorneys-from the city of New York, they all very well knew that the-consideration of six thousand dollars was too insignificant a sum for the transfer of property to the value of one hundred and fifty thousand dollars, or upwards, which accounts for the consideration mentioned in the transfer to be for one dollar and divers other good causes and considerations, and at-the same time Herman Thorn gives his obligation to Elizabeth Hait for six thousand dollars.
Regarding the assignment from Elizabeth Hait to Herman Thorn as a matter of bargain and sale, there is much in the evidence tending to support the charge of undue influence, concealment and fraud, which entitles the complainant to-relief in a court of equity. The parties did not stand upon equal ground ; Colonel Thorn was a man of business qualifications, in the prime of life, and knew well the value of the-property he was contracting for. Miss Elizabeth Hait was-a female, over the age of seventy years, of retired habits and excitable disposition, easily thrown off her guard, and entirely incompetent to transact business of such magnitude-The contract was entered into by her without the advice of counsel or the presence of a friend, against the wishes of her relatives, and contrary to the advice of her neighbors; while Colonel Thorn, in addition to his superior business qualifications, had the advice and assistance of two eminent attorneys (Mr. Hamilton and Griffin) from the city of New York. Mr. Hamilton first paid two visits to Miss Hait *751 Then followed three visits from. Col. Thorn, at one of which he stayed two nights. She complained to Frasee Hains that she could not sleep, in consequence of the annoyance of Colonel Thorn. He did not leave her house until he procured the assignment.
Taking, then, the true consideration of the transfer and assignment to be six thousand dollars, it was grossly inadequate ; it bore no relation, whatever, to the value of the property transferred. These circumstances alone, aside from any evidence of actual fraud, are of such a nature as to call for the aid of a court of equity ; they afford sufficient ground upon which the court may interfere to relieve against such unfair and unconscionable contracts.
I am clearly of the opinion the said transfer and assignment, dated the twenty-seventh March, 1833, was obtained by Herman Thorn from Elizabeth Hait, by undue influence, and through ignorance, on her part, of the character, extent and value of her rights in the said residuary estate; and was and is fraudulent as against the said Elizabeth Hait, and the appellant as her representative; and that the re-acknowledgment of the said transfer and assignment, and the several authorities to substitute and appoint solicitors in the two suits in the Court of Chancery of New York, in the pleadings and proofs mentioned, were obtained from her by the said Herman Thorn, in furtherance of the original assignment, without removing the impositions and undue influence, and while she was laboring under the ignorance of her rights, and of her right to have the assignment opened in a court of equity, and do not ratify her transfer and assignment.
The orders and decrees in the two suits in the Court of Chancery of New York, on the seventh June, 1833, and the further order and decree made therein, on or about the eighteenth of June, 1834, as mentioned in the pleadings and proofs in this cause, so far as the same affect the said Elizabeth Hait and her rights, were founded upon default suffered and consent given by solicitors in said suits, appointed by the said Herman Thorn, who appeared and acted therein *752 under the instructions and directions of Herman Thorn, in pursuance and in furtherance of said fraudulent assignment; and the execution of said decrees, in further fulfillment thereof, were all made and obtained by the said Herman Thorn, while she was laboring under the imposition aforesaid, and under the ignorance of her rights in law; therefore the said decrees are fraudulent as against her and her representative. The principle is well settled that, in order to ratify a transaction originally procured through fraud or undue influence, the imposition must be completely removed and cleared up, and the party apprised of her right in equity to relief against the fraudulent practice. None of this was done in the present case. The decrees of the Court of Chancery of New York, in the said suits, have been fully executed, the money paid over in obedience thereto, by John Rutherford, the executor of William Jauncey, and have been received by Herman Thorn, or on his behalf, in the absence of all fraud on the part of said executor in complying with said decree, and without any notice thereof by h-im,. or that the said decrees were not binding on the said Elizabeth Hait; therefore the said complainant is not entitled to recover of the said Mary Rutherford, executor of said John Rutherford, any part of the assets so paid or transferred by the said John Rutherford, in pursuance of said decrees, nor to open the accounts of the said John. Rutherford, but'that said decrees and account do stand in full force, for the protection of his representatives and of his estate.
The assignment and authorities were procured by Herman Thorn, in this state, and he immediately thereafter left this state, and in a few weeks departed from the United States, and resided in Europe with his family for twelve years and upwards, and was not, during that term, within this state; therefore her representative is not barred by any limitation of or lapse of time, from recovering against him. The appellant is entitled in equity to recover from Herman Thorn the amount of one-sixth of the said residuary bequest so paid over to him, or permitted by John Rutherford, executor of William Jauncey, to be received by him, the said Thorn, or *753 on his behalf, and that it be referred to a master to take an account, with accumulations to be charged, and deductions to be made for the six thousand dollars paid as consideration money on said assignment and other equitable allowance, on which final decree is to be rendered, with costs in both suits, in favor of the appellant.
And that the appellant is entitled to the benefit of the mortgage given by Herman Thorn to the said John Rutherford on the premises called Elmwood, (mentioned in the pleadings,) dated the sixth day of June, 1833, for the indemnity of the said John Rutherford, in manner therein mentioned and set forth, and to have said mortgage assigned to him for that purpose, and to be prosecuted hereafter under the direction of the Court of Chancery, in ease the said Herman Thorn shall fail to pay the appellant the amount which may or shall be recovered against him under the final decree of the court in this cause.
The decree of the Court of Chancery was affirmed by the following vote:
For Affirmance—Justices Ogden, Elmer, Potts and Haines, Judges Cornelison, Risley, Huyler and Arrowsmith.
For Reversal—Judge Valentine.
Cited in Tomkins v. Tomkins, 3 Stockt. 514; Howell v. Green, 2 Vr. 572.